**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **ALJESS LLC and HEADQUARTERS PUB LLC,** | : | |
| *Plaintiffs,* | : | |
| | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | **NO. 24-2388** |
| **TUN TAVERN LEGACY FOUNDATION INC.,** | : | |
| *Defendants.* | : | |

## MEMORANDUM OF LAW

In this trademark infringement action, Plaintiffs Aljess, LLC and Headquarters Pub, LLC (collectively the "Plaintiffs") moved for a preliminary injunction against Defendant Tun Legacy Foundation, Inc. ("Defendant" or the "Foundation;" formerly named "Tun Tavern Legacy Foundation, Inc.") to enjoin Defendant from using its trademark THE TUN. In consideration of the parties' filings (ECF No. 13, 15, 16, 18, 21, 27, 28, 29, 30, 34) and oral arguments on November 6 and 7, 2024 (ECF No. 31, 32), the Court denies Plaintiffs' motion for failure to demonstrate irreparable harm.

## BACKGROUND

In the late 1600s, the Tun Tavern was built in Philadelphia, Pennsylvania. According to Marine Corps lore, the idea for the United States Marine Corps was born in the Tun Tavern. *See* Sturkey, Marion F., *Warrior Culture of the U.S. Marines* (3rd ed.) USMC Press 2009 ("Ask any Marine. Just ask. They will tell you that the Marine Corps was born in Tun Tavern in Philadelphia on 10 November 1775"). But near the end of the Revolutionary War, the Tun Tavern burned down and was not rebuilt. Today, a memorial marker sits at Water Street and Tun Alley, commemorating the lost institution. Plaintiffs and Defendant both cherish the Tun

Tavern's history, but their dispute over the name that packages the retelling of the tavern's history is the basis of this trademark infringement action.

Plaintiffs Aljess, LLC and Headquarters Pub, LLC are both controlled by Montgomery Dahm. Mr. Dahm is the owner of the Tun Tavern restaurant in Atlantic City, New Jersey. ECF No. 13 at 4. In 1998, Mr. Dahm received a license to use the trademarks TUN TAVERN for beer and restaurant and bar services from the Marine Corps Tun Tavern Foundation, Inc.—which was the original registrant of TUN TAVERN. Id. In 2013, the Marine Corps Tun Tavern Foundation, Inc. assigned Aljess, LLC the right to use TUN TAVERN. Id.

The Tun Legacy Foundation, Inc. is a 501(c)(3) charitable organization that intends to build a historical recreation of the Tun Tavern near its former site in Philadelphia, Pennsylvania. ECF No. 15 at 3. Defendant's stated mission is to "donate all profits generated by sales of period-inspired food and beverages and merchandise to be offered at the reconstructed tavern to veterans' organizations and other charities." Id. As early as 2021, Defendant began negotiating with Mr. Dahm for use of TUN TAVERN, but ultimately the negotiations did not produce an agreement. ECF No. 32 at 94; ECF No. 27 at 27-36. On August 24, 2021, Defendant filed an "intent to use" application with the United States Patent and Trademark Office ("USPTO") for the mark THE TUN for use in connection with bar and restaurant services, among other things. ECF No. 15 at 4-5. The USPTO issued a Notice of Allowance on July 11, 2023, after no opposition was received to the publication of THE TUN. Id. at 10.

On February 13, 2024, Aljess issued a cease-and-desist letter to Defendant, alleging trademark infringement for use of THE TUN in connection with Defendant's future bar and restaurant establishment. ECF No. 13 at 9. Eventually, Plaintiffs filed suit against Defendant, and sought a preliminary injunction. Evidentiary hearings were held on November 6 and 7, 2024.

Plaintiffs argued that Defendant should be preliminary enjoined from using THE TUN until a trial on the merits, and more immediately, Defendant should be enjoined from using THE TUN and TUN TAVERN at its November 10, 2024, block party celebration for the building of The Tun in Philadelphia. At the November 7, 2024 hearing, this Court put in place an interim injunction enjoining Defendant from using "the word Tun with Tavern right next to it," effective until this present decision is docketed. ECF No. 32 at 128-29.

## STANDARD

To succeed on a motion for preliminary injunction, a movant must satisfy all elements: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). A preliminary injunction is "an extraordinary remedy" and "should be granted only in limited circumstances." *Id.*

## DISCUSSION

### I.    LIKELIHOOD OF SUCCESS ON THE MERITS

To demonstrate trademark infringement under the Lanham Act, the owner of a valid mark must demonstrate that "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990); *see also Kos Pharms.*, 369 F.3d at 708-09 (a movant "must show that a defendant's use of a similar mark for its goods 'causes a likelihood of confusion.'"). The parties only contest the last element.[1]

---

[1]    Plaintiffs noted that the marks TUN TAVERN for International Class No. 32 for "beer" and International Class No. 43 for "restaurant and bar services" was assigned to Aljess, LLC on March 19, 2013. ECF No. 13 at 4.

In determining whether a defendant's use of a mark is likely to create confusion, courts rely on ten factors set out in *Interpace Corp. v. Lapp, Inc.*:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

721 F.2d 460, 463 (3d Cir. 1983). No one factor is determinative; they must all be balanced and weighed against each other. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001). "[C]onsideration of the *Lapp* factors . . . can be quite useful for determining likelihood of confusion even when the goods compete directly." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 212 (3d Cir. 2000).

i. ***Lapp* Factor One: Degree of Similarity**

Marks "are confusingly similar if ordinary consumers would likely conclude that [two products] share a common source, affiliation, connection or sponsorship." *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 477 (3d Cir. 1994). Courts should not conduct a "side-by-side comparison," but instead should analyze "whether the labels create the same overall impression when viewed separately" by examining sight, sound, and meaning of the

---

Plaintiffs further alleged that its marks are incontestable under 15 U.S.C. § 1065, and therefore the first two elements of a trademark infringement claim are satisfied. Id. at 13; *see also Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991) ("If the mark at issue was federally registered and had become 'incontestable', pursuant to 15 U.S.C. §§ 1058 and 1065, validity, legal protectability, and ownership are proved."). Defendant did not contest the first two elements and only argued the third. ECF No. 15 at 10.

marks. *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010). The Third

Circuit has stated that "degree of similarity of the marks may be the most important of the ten

factors in *Lapp*." *Fisons Horticulture,* 30 F.3d at 476.

In their brief, Plaintiffs argued that TUN TAVERN and THE TUN are nearly identical,

and "Tun," the operative word in its mark, is frequently used in association with "Tavern" and

implicitly cannot be detached from it. ECF No. 13 at 13. Moreover, Plaintiff argued that the two

marks create the same overall impression because they both are registered under merchandise

and bar and restaurant trademark categories. Id. In addition, Plaintiff offered some testimony and

evidence that in the minds of Marine Corps consumers, "The Tun" is shorthand for Tun Tavern.

ECF No. 27 at 97-109; ECF No. 27 at 139.

In opposition, Defendant pointed out that the USPTO had already issued a Notice of

Allowance for THE TUN, indicating that the USPTO examining attorney concluded that the

marks are not confusingly similar. ECF No. 15 at 11. The USPTO also approved the Marine

Corps' registration of TUN ALLEY, which Defendant argued is indicative of the USPTO's view

that simply having the word "Tun" in a trademark does not make it confusingly similar to

Plaintiffs' TUN TAVERN trademark. Id. at 11-12. Moreover, Defendant argued THE TUN and

TUN TAVERN have different syllables, unlike TUN TAVERN and TUN ALLEY which have

the same number of syllables. Id. at 16-17. Chiefly, given Defendants strong evidence that the

USPTO's examining attorney had already issued a Notice of Allowance for THE TUN, this

factor weighs in favor of Defendant.[2]

---

[2]    The USPTO website explains that an examining attorney reviews an application to ensure it meets all the legal requirements, and lists likelihood to cause confusion with an already registered trademark as a non-fixable mistake barring approval of an application. https://www.uspto.gov/trademarks/basics/common-problems. "The assigned USPTO examining attorney will search the federal database for conflicting trademarks (registered or pending) when they examine your application regardless of whether you completed a comprehensive clearance search before filing the application. The examining attorney will issue a refusal to register your trademark if they

## ii.  *Lapp* **Factor Two: Strength of the Owner's Mark**

"Under the Lanham Act, stronger marks receive greater protection" because they "carry greater recognition, and that therefore a similar mark is more likely to cause confusion." *A & H Sportswear*, 237 F.3d at 222. The strength of a mark is determined by "the distinctiveness or conceptual strength of the mark" and "the commercial strength or marketplace recognition of the mark." *Id.* at 221. "[C]ourts must look at the strength of the mark in the industry in which infringement is alleged." *Checkpoint Sys.*, 269 F.3d at 284.

### Conceptual Strength

With respect to conceptual strength, marks are typically classified into one of four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *See A & H Sportswear*, 237 F.3d at 222 (describing the different categories). Here, TUN TAVERN is descriptive because tun—a large cask to store beer—and tavern—an establishment for the sale of alcohol to be consumed on the premises—together are words used to describe Plaintiffs' restaurant.

A descriptive mark, however, needs a demonstrated secondary meaning to be considered a strong mark. *Checkpoint Sys.*, 269 F.3d at 282-83, n.10 (listing factors to determine whether a mark has achieved a secondary meaning, such as "the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the size of the company, the number of sales, the number of customers, and actual confusion."). Applying these *Checkpoint Sys.* factors to the evidence presented, TUN TAVERN, on balance, does have secondary meaning.

---

determine there is a likelihood of confusion between your trademark for the specified goods or services and a registered trademark for related goods or services." https://www.uspto.gov/trademarks/search/likelihood-confusion

*Extent of sales and advertising leading to buyer association*

Plaintiffs claimed it has spent over $800,000 marketing TUN TAVERN since 2009. ECF No. 13 at 4. There is no evidence, though, that Plaintiffs' marketing contributed to customer association. Without more, this piece of evidence does not weigh one way or the other.

*Length of use and exclusivity of use*

Plaintiffs have used TUN TAVERN since 1998 and Aljess later was assigned the mark on August 12, 2013. However, subject to the assignment, Aljess would continue to allow the Marine Corps to use TUN TAVERN for its restaurant in Quantico, Virginia, so Plaintiffs use of the mark has not been exclusive. ECF No. 27 at 140. Before TUN TAVERN was assigned to Aljess, the Marine Corps notified the Marine Corps Tun Tavern Foundation, Inc.—the original holder of the TUN TAVERN trademark—that it would use the mark in association with a small pub opening inside the National Museum of the Marine Corps in Quantico, Virginia. ECF No. 27 at 140. Plaintiffs explained that the mark's assignment in 2013 was subject to consent for the pub's use. ECF No. 32 at 106-07. This weighs against finding secondary meaning.

*Customer testimony*

Plaintiff also claimed there is evidence that customers will likely be confused. There were numerous examples of customers leaving reviews on Tripadvisor, referring to the Tun Tavern as "Tun" or "the Tun." ECF No. 27 at 97-109. Plaintiffs also offered a declaration from Mark Gautier, who claimed to be a regular customer of Tun Tavern. ECF No. 27 at 139. He claimed that he and his friends referred to Tun Tavern as "The Tun," and Defendant's future establishment would cause confusion. Id.

At the November 6, 2024 hearing, William Tubb testified that he read an Inquirer newspaper headline in April 2024, causing him to believe Mr. Dahm was expanding his

restaurant business into Philadelphia. ECF No. 27 at 6-7; ECF No. 31 at 48-49. He called Mr. Dahm to congratulate him on his restaurant expansion in Philadelphia but learned during that phone call that there was no relation between Mr. Dahm and The Tun. ECF No. 27 at 6-7; ECF No. 31 at 48-49.

Attached with Plaintiffs' reply brief, they proffered a declaration from retired U.S. Marine Kevin Ellicott. ECF No. 18-4. Mr. Ellicott attested that he believed Mr. Dahm was involved in building The Tun in Philadelphia when he read an article about it. Id. These customer accounts weigh in favor of finding secondary meaning, though the weight of these accounts is not overwhelming.

*Number of customers*

Plaintiffs offered into evidence a list of the Tun Tavern restaurant's VIP club members, containing about 4,000 members. ECF No. 27 at 41-95; ECF No. 31 at 61. The Tun Tavern's number of customers weighs in favor of finding secondary meaning.

*Actual confusion*

After Defendant's November 10, 2024 block party, Plaintiffs submitted additional evidence that at least three video news segments and two written articles referred to the future project as the "Tun Tavern" or the "new Tun Tavern," evidencing consumer confusion with respect to the name at least. ECF No. 29-1 at 4. From this evidence alone, it is unclear if those news outlets were confusing Defendant's future project in Philadelphia with Plaintiffs' restaurant in Atlantic City, or merely rather confusing The Tun's name with its historical correlate's name. But overall, this evidence weighs slightly in favor of finding secondary meaning.

**Commercial Strength**

Commercial strength focuses on the consumer's recognition of a mark and can be demonstrated by advertising costs and revenue. *A & H Sportswear*, 237 F.3d at 224. However, these relevant considerations are not automatically determinative of consumer recognition. *Id.* Plaintiffs wrote that they spent over $800,000 in marketing the Tun Tavern since 2009, and Mr. Dahm testified that he estimates he has spent $1.5 million dollars total in advertising the Tun Tavern. ECF No. 13 at 5; ECF No. 31 at 59. Without more evidence, it is difficult to say that Plaintiffs' marketing costs suggest strong consumer recognition among Marines. Specifically, whether Marines indeed associate Tun Tavern bar and restaurant services with Plaintiffs' Atlantic City restaurant, rather than, say for instance, the Tun Tavern in Quantico, Virginia. On the other hand, Plaintiffs' submission of its restaurant's VIP club members and Tripadvisor reviews offers at least some evidence of TUN TAVERN's commercial strength. ECF No. 27 at 41-95; ECF No. 27 at 97-109. Therefore, overall, this second factor tips slightly in Plaintiffs' favor.

   iii.    ***Lapp* Factor Three: Price and Other Factors**

If a consumer is more likely to use heightened care when making a purchasing decision, then there is a lesser likelihood of consumer confusion as to the product's source or affiliation. *Checkpoint Sys.*, 269 F.3d at 284. For instance, if a product is expensive or the "buyer class consists of sophisticated or professional purchasers," then there is likely no potential for confusion. *Id.*

The buyer class—Marine Corps members, veterans, and affiliates—is the same for both parties. But because Defendant has not yet built The Tun, Plaintiffs and Defendant's bar and restaurant service prices cannot be compared. The only point of comparison currently are the

9

price differences between Plaintiffs and Defendant's products. Defendant offers products on its website in return for charitable donations. ECF No. 15 at 10. Those items include a $2,500 32-ounce copper mug, $1,000 16-ounce mug, $750 miniature framed brick, $500 brick paver, $250 polo shirt, $200 wood mug, and $35 t-shirt. ECF No. 15 at 5; https://thetun.org/contribute/united-states-marines/. In comparison, Plaintiffs sell $28 long sleeve and $23 short sleeve Tun Tavern shirts. ECF No. 15 at 12; https://www.tuntavern.com/tun-tavern-buy-merchandise/. The only similarly priced items between the two parties are their shirts. Otherwise, Defendant's products are vastly more expensive than Plaintiffs' products. Therefore, a consumer is unlikely to be confused about the source or origin of Plaintiffs and Defendant's products, and this factor weighs in favor of Defendant.

iv. ***Lapp* Factor Four and Six: Time Without Actual Confusion and Evidence of Actual Confusion**

The Court will assess time without actual confusion (*Lapp* factor four) and evidence of actual confusion (*Lapp* factor six) together. *See e.g. Primepoint, L.L.C. v. PrimePay, Inc.*, 545 F. Supp. 2d 426, 441 (D.N.J. 2008) ("Because *Lapp* factors four and six significantly overlap, this Court will address both simultaneously."). "[T]wo parties' concurrent use of 'similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products' allows 'an inference that future consumers will not be confused either.'" *Kos Pharms.*, 369 F.3d at 717. Evidence of actual confusion between two marks is "highly probative of the likelihood of confusion," even if the incidents comprise a small percentage of the consumer base. *Checkpoint Sys.*, 269 F.3d at 291; *Kos Pharms.*, 369 F.3d at 720.

Plaintiffs offered witness accounts, media examples, and Defendant's own actions to demonstrate actual confusion since Defendant began publicly soliciting donations in November

10

2023 for The Tun. *See Kos Pharms.*, 369 F.3d at 718 (indicating hearsay in affidavits may be considered at the preliminary injunction stage). Mark Gautier, who claimed to be a regular customer of Tun Tavern, declared that he and his friends referred to Tun Tavern as "The Tun," and Defendant's future establishment would cause confusion. ECF No. 27 at 139. He claimed that when he heard of The Tun potentially opening in Philadelphia, he assumed it was an extension of the Tun Tavern business in Atlantic City. Id.

William Tubb attested that he read an Inquirer newspaper headline in April 2024, causing him to believe Mr. Dahm was expanding his restaurant business into Philadelphia. ECF No. 27 at 6-7; ECF No. 31 at 48-49. He called Mr. Dahm to congratulate him on his restaurant expansion in Philadelphia but learned on that phone call that there was no relation between Mr. Dahm and The Tun. ECF No. 27 at 6-7; ECF No. 31 at 48-49. However, Defendant correctly pointed out that Mr. Tubb only read the headline, not the actual article. ECF No. 31 at 48. If he had read the article's contents, Mr. Tubb would have read numerous quotes from members of the Foundation and no quotes from Mr. Dahm. Id.

Kevin Ellicott declared that he believed Mr. Dahm was involved in building The Tun in Philadelphia when he read an article about it. ECF No. 18-4. He reached out to Mr. Dahm to congratulate him but learned there was no affiliation. Id.

Moreover, after the November 10, 2024 block party took place, Plaintiffs submitted additional evidence that at least three video news segments and two written articles referred to the future project as the "Tun Tavern" or the "new Tun Tavern." [3] ECF No. 29-1 at 4. One of the

---

[3]    Plaintiffs submitted supplemental evidence not to hold Defendant in contempt of court for allegedly violating this Court's interim preliminary injunction, but to demonstrate actual confusion. ECF No 29-1 at 7. Defendant filed its own motion to supplement, explaining that it followed this Court's interim order. ECF No. 30 at 2-3. was misplaced, as Plaintiffs did not seek sanctions against Defendant for violating the order. ECF No. 30 at 2-3; ECF No. 34 at 2. However, Defendant is free to supplement the record with its own evidence of compliance, even if non-responsive to Plaintiffs' motion, and so both parties' additional evidence was considered in ruling on this preliminary injunction.

speakers at the event also referred to the future construction of The Tun as "Tun Tavern." ECF No. 29-1 at 6. Defendant contended that these instances still do not create confusion that the Tun Tavern in Atlantic City, New Jersey, and The Tun in Philadelphia, Pennsylvania—which is not yet in existence—share an affiliation or connection. ECF No. 30 at 3.

Third, Plaintiffs pointed to Defendant's own actions as a source of confusion. Board of director member Matthew Swindle's business card contained the following: a title named "The Tun Tavern Legacy Foundation;" a picture in the top right-hand corner that says, "The Tun Tavern," where "Tun" occupies most of the space; and Swindle's email with the handle "@tuntavernphila.org." ECF No. 27 at 39. Mr. Dahm also testified that he frequently saw Defendant using the name Tun Tavern on social media to advertise or promote its development of The Tun. ECF No. 31 at 64. Defendant contended that it has since removed mentions of "Tun" next to the word "Tavern" from its website and social media and instructed its representatives to refrain from using the conjoined phrase. ECF No. 30 at 1-2.

In support of Defendant's contention of no confusion, Robert Brink, chairman of Defendant's board of directors, claimed that he is not aware of "a single incident in which any member of the public has confused our organization or the historically accurate version of The Tun that we plan to build in Philadelphia with the Plaintiffs' brewpub in Atlantic City." ECF No. 15 at 20; ECF No. 27 at 180-81. Defendant also argued that, at most, people think there might be a connection between Tun Tavern and The Tun, but this is not evidence of actual confusion. ECF No. 15 at 15.

At the very least, clearly there is confusion about the name of Defendant's future establishment. Plaintiffs do not specify whether the video news segments confuse The Tun's name for the historical Tun Tavern or Plaintiffs' Tun Tavern in Atlantic City. Moreover, the

article in the *Army Times* referred to Tun Tavern both in the historical sense and as the name of Defendant's future establishment. See e.g. ECF No. 29-2 at 15 ("Once operational, proceeds from the new Tun Tavern and restaurant will go to charities connected to the organizations with connections to Tun Tavern, Dailey said."). Aside from Plaintiffs' witness affidavits, it is not clear that members of the public are actually confusing Defendant's The Tun with Plaintiffs' Tun Tavern in Atlantic City. Rather, it is possible that news outlets are simply misnaming The Tun as Tun Tavern because The Tun is meant to commemorate the historical Tun Tavern. The relevant inquiry here is whether there is actual consumer confusion regarding the relation between The Tun and the modern Tun Tavern in Atlantic City. Evidence of media outlets confusing the name of Defendant's enterprise as Tun Tavern and Defendant's past advertisements using the conjoined phrase Tun Tavern certainly do not alleviate confusion, and may permit an inference of consumer confusion, but they are not evidence of actual consumer confusion. As the evidence stands now, Mr. Gautier, Mr. Tubb, and Mr. Ellicott's statements are the only pieces of evidence demonstrating actual confusion. Considering their credibility and relation to Plaintiffs, this Court finds that factors four and six tip somewhat in favor of Plaintiffs.

   v.   ***Lapp* Factor Five: Defendant's Intent**

   A defendant's "intentional, willful and admitted adoption of a mark closely similar to the existing marks" is strong overall evidence of a likelihood of consumer confusion. *Checkpoint Sys.*, 269 F.3d at 286. "The adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion, are highly relevant." *Kos Pharms.*, 369 F.3d at 721.

   Before Defendant's submitted its trademark application for THE TUN, Defendant and Mr. Dahm engaged in preliminary negotiations to discuss Defendant's licensing of TUN

TAVERN. ECF No. 18 at 9; ECF No. 27 at 27; ECF No. 31 at 102; ECF No. 32 at 121-22.

During those negotiations, Pat Daily, founder of the Foundation, stated "I do understand and am

sensitive to your concerns that a 'Tun Tavern' in Philadelphia could hurt your business, so that

will be foremost in our brainstorming sessions on how to approach this fairly." ECF No. 27 at

27. Mr. Dahm referred to Tun Tavern as "the Tun" three times in his April 25, 2021 email to Mr.

Dailey, which was prior to Defendant's THE TUN registration. ECF No. 27 at 162.

After negotiations were not successful, Defendant filed an "intent to use" application in

August 2021 with the USPTO for THE TUN and it was subsequently approved. ECF No. 15 at

4; ECF No. 31 at 102. Mr. Dahm learned of THE TUN mark in approximately December 2023,

and sent Defendant a cease-and-desist letter in February 2024 demanding that Defendant stop

using THE TUN due to trademark infringement. ECF No. 13 at 10; ECF No. 32 at 28. After

Defendant received the cease-and-desist letter, negotiations began again and Defendant

requested time to propose a solution. ECF No. 27 at 24-25. During that time, Defendant changed

its web domain from www.tuntavern.org to www.thetun.org, and placed a statement on its

website disclaiming any connection between The Tun and the Tun Tavern in Atlantic City or in

Quantico, Virginia. ECF No. 15 at 21; see https://thetun.org/.

Plaintiff also argued that Defendant's trademark warrants cancellation under 15 U.S.C. §

1064(3) because Defendant fraudulently certified to the USPTO that it was not aware of a

confusingly similar mark. ECF No. 18 at 8-9. However, this Court does not go so far as to find

Defendant fraudulent in filing its trademark application. Defendant stated that they were trying to

negotiate the TUN TAVERN mark in good faith to avoid a potential dispute down the line, but

they ultimately concluded that THE TUN was not close enough when filing with the USPTO

14

because, in their view, it is unlikely consumers would confuse Plaintiffs' modern restaurant in Atlantic City with its historical recreation in Philadelphia. ECF No. 32 at 121-22.

Although this Court does not find fraudulence on the part of Defendant, it is suspicious that Defendant would attempt to license TUN TAVERN from Mr. Dahm and then later register THE TUN after Mr. Dahm repeatedly referred to the Tun Tavern as "the Tun" in email correspondence. Therefore, this factor tips in favor of Plaintiffs.

### vi.    *Lapp* Factor Seven: Marketing and Advertising

This factor assesses "whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media." *A & H Sportswear*, 237 F.3d at 215. The more similar the methods of advertisement between two marketing campaigns, the greater the likelihood of confusion between the marks. *Checkpoint Sys.*, 269 F.3d at 288-89. This Court must examine the "media the parties use in marketing their products as well as the manner in which the parties use their sales forces to sell their products to consumers." *Kos Pharms.*, 369 F.3d at 722.

Here, both parties market their enterprises through social media and their websites. ECF No. 15 at 18. Both parties also marketed their enterprises through a U.S. Marine Corps anniversary celebration; Mr. Dahm has historically held a buffet celebration and Defendant held a block party celebration to drum up interest around The Tun. ECF No. 31 at 7, 60. Tun Tavern also advertises through restaurant review websites (e.g. Tripadvisor, Yelp, and OpenTable) and via email flyers to a listserv. ECF No. 15 at 23; ECF No. 31 at 61. Defendant claimed that unlike Plaintiffs, it has issued numerous press releases, engaged in interviews, participated in numerous face-to-face meetings with potential donors, and attended large expositions such as Modern Day Marine and the National Convention of the Veterans of Foreign Wars. Id.

It appears that the parties' methods of advertisement have some overlap, namely social media and websites. It is also plausible, based on the evidence, that both parties similarly maintain email lists for consumers that are interested in the Marine Corps and its history. Although Defendant provided some separate advertising avenues, to which Plaintiffs had no response, the evidence indicates that this factor tips slightly in Plaintiffs' favor.

   vii.    ***Lapp* Factor Eight: Target Audience**

If the parties have the same consumer base as targets for their businesses, then there is a greater likelihood of confusion between the two marks. *Checkpoint Sys.*, 269 F.3d at 288-89. Here, both Tun Tavern and The Tun seek to engage Marines, former Marines, and Marine Corps enthusiasts. Defendant argued that Plaintiffs' restaurant merely engages Marines in Atlantic City, while its proposed project will engage Marines, Freemasons, and Navy veterans nationwide, as well as hereditary societies that were founded in Philadelphia. ECF No. 15 at 18. Plaintiffs, however, provided a VIP club members list, containing about 4,000 members, showing that the members are from different states. ECF No. 27 at 41-95. Although the majority of the VIP members have listed addresses in New Jersey, a fair number of members are listed in Pennsylvania, New York, and other east coast states. Id. Thus, Plaintiffs' audience is not so hyper localized to Atlantic City as Defendant suggests, and this factor weighs in favor of Plaintiff.

   viii.    ***Lapp* Factor Nine: Perceived Relationship in the Minds of Consumer**

In considering the ninth *Lapp* factor, this Court considers "whether it would be reasonable for consumers to associate [two products] or see them as related." *Kos Pharms.*, 369 F.3d at 723. The more closely related the products, the greater the likelihood for confusion. *Id.* at 722-23; *see also Checkpoint Sys.*, 269 F.3d at 286 ("whether the goods are similar enough that a

16

customer would assume they were offered by the same source."). "Goods need not be identical for this factor to support finding a likelihood of confusion." *Kos Pharms.*, 369 F.3d at 723.

In this case, both the Tun Tavern and The Tun (if and when its built) are establishments in the bar and restaurant industry. Currently, Tun Tavern sells food, drinks, and merchandise, and The Tun will do the same. Defendant argued that the difference in its food, drinks, merchandise, atmosphere, charitable mission, and overall experience leaves no doubt that a consumer could not confuse The Tun with the Tun Tavern in Atlantic City. ECF No. 15 at 24-25. Defendant claimed that The Tun will not be serving modern pub fare (e.g., chicken wings, burgers, etc.) like Plaintiffs' Tun Tavern, but rather it will offer period-influenced food and drinks. Id. Moreover, Defendant said The Tun will include entertainment, educational experiences, and historical exhibits. Id. Defendant also pointed to the price differences between their memorabilia and Plaintiffs' memorabilia, and the difference in Defendant's charitable mission and Plaintiffs' for-profit restaurant. Id. at 25.

Although it is difficult to compare the existent Tun Tavern with the non-existent The Tun, it is reasonable that Marines, veterans, and their affiliates would believe that The Tun restaurant in Philadelphia is related to the Tun Tavern restaurant in Atlantic City, notwithstanding Defendant's attestation that they will differ aesthetically. Tun Tavern operates in the bar and restaurant industry, and so too will The Tun. Although it is true that "[g]oods may fall under the same general product category but operate in distinct niches," Defendant's claim that the historical museum aspect of The Tun is enough of a distinct niche to separate it from the Tun Tavern's bar and restaurant services does not hold weight. *See Checkpoint Sys.*, 269 F.3d at 288. Moreover, Defendant has not explained if its consumer base— Marines, veterans, and their affiliates—would have specialized knowledge to make a distinction between The Tun and the

Tun Tavern's origin. *See e.g., Checkpoint Sys.*, 269 F.3d at 288 (*citing Astra Pharm. Prod., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1207 (1st Cir. 1983) (finding no similarity between medical technology sold to different departments in the same hospital because of the technical and specialized knowledge of the relevant purchasers)).

However, the geographic distance between the Tun Tavern in Atlantic City and The Tun in Philadelphia may prevent substantial consumer overlap. *Kos Pharms.*, 369 F.3d at 723 ("Courts may consider here 'whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source[,] affiliation or sponsorship.'"). Plaintiffs argued they have substantial consumer overlap, as evidenced by the decline in reservations for the Tun Tavern's Marine Corps anniversary due to competition with Defendant's anniversary block party. ECF No. 31 at 61-62. Plaintiffs did not causally link the Tun Tavern's reservation decline with Defendant's block party, but the decline does somewhat indicate an overlap between Plaintiffs and Defendant's consumer base for annual celebratory events. Therefore, this factor leans in favor of Plaintiff.

**ix.** ***Lapp* Factor Ten: Other Facts**

Last, this Court will analyze whether there are "other facts suggesting that the consuming public might expect the [plaintiff] to manufacture a product in the defendant's market, or that it is likely to expand into that market." *Checkpoint Sys.*, 269 F.3d at 290. In this context, the relevant question is whether the consumer base might expect Plaintiffs to expand their restaurant enterprise into Philadelphia. If it appears "extremely likely" that Plaintiff "will soon enter the defendant's field," then that would weigh in favor of providing injunctive relief. *Id.*

Mr. Dahm voiced that he intended to expand his Tun Tavern restaurant enterprise into Philadelphia. ECF No. 13 at 6; ECF No. 31 at 70. As proof of his intent, Mr. Dahm and Michael

18

Driscoll—Mr. Dahm's prospective business partner—testified that their businesses signed a letter of intent to begin Tun Tavern catering and pop-up restaurants in 2026, which could potentially lead to a more permanent restaurant establishment in Philadelphia. ECF No. 31 at 14, 70. And certainly, Mr. Dahm has the expertise to start a Tun Tavern restaurant in Philadelphia. *See Checkpoint Sys.*, 269 F.3d at 291-92 (affirming the district court's finding that consumers were unlikely to expect plaintiff to "have the expertise" to enter defendant's field due to "highly specialized and technical nature" of defendant's products).

However, Defendant correctly pointed out that it is the *consuming public* perspective that is relevant here, not Plaintiffs' intent to enter the market. ECF No. 15 a 26. Mr. Driscoll testified that the letter of intent is confidential, so there would be no occasion for this letter to impact the consuming public's expectation that Plaintiffs would expand into Philadelphia. ECF No. 31 at 31; ECF No. 15 at 26. Moreover, the letter of intent is not proof that Plaintiffs are "extremely likely" to "soon" enter the Philadelphia market. Mr. Driscoll testified that this present litigation has paused financing discussions with Mr. Dahm at this time. ECF No. 31 at 14-15. He also testified that his and Mr. Dahm's goal was to have the "business up and running" by 2026 in time for the 250th anniversary of the United States. Id. at 14. Therefore, this factor leans in favor of Defendant.

x.    **Balancing the *Lapp* Factors**

Determining which party is likely to succeed on the merits is a close call. *Lapp* factors 2, 4, 5, 6, 7, and 9 tip in favor of Plaintiffs, though not strongly, but *Lapp* factor 8 strongly favors Plaintiffs. *Lapp* factors 1—which the Third Circuit has indicated is the most important factor— 3, and 10 solidly favor Defendants. Overall, neither party has an airtight case for its likelihood of success on the merits. A balance of the *Lapp* factors could favor either party. However, this

Court will assume that Plaintiffs have met their burden of demonstrating a likelihood of success on the merits and will proceed with the analysis below.

## II.    IRREPARABLE HARM

To prevail on a motion for preliminary injunction, a party must demonstrate a likelihood that it will suffer irreparable harm if the court does not grant the motion. The Trademark Modernization Act ("TMA") created a rebuttable presumption of irreparable harm if a plaintiff can demonstrate likelihood of success on the merits. *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 184-85 (3d Cir. 2022); 15 U.S.C. § 1116(a). Because the TMA does not explain how its rebuttable presumption applies, courts follow the Federal Rules of Evidence in this context. Federal Rule of Evidence 301 instructs that "the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally." FED. R. EVID. 301; *see Nichino Am., Inc.*, 44 F.4th at 185 ("Over-scrutinizing the persuasive value of evidence proffered on rebuttal would violate Rule 301 by shifting the burden of persuasion, not just the burden of production."). Rather, a defendant's rebuttal evidence must simply be "enough to allow a reasonable factfinder to conclude that irreparable harm is unlikely." *Nichino Am., Inc.*, 44 F.4th at 185. If a defendant satisfies its slight evidentiary showing, the presumption "simply disappears like a bursting bubble." *Id.* at 186.

Assuming that Plaintiffs have established a likelihood of success on the merits, this Court will apply the presumption of irreparable harm. Here, Plaintiffs have two separate bases for irreparable harm: (1) Defendant's The Tun will unfairly compete with the Tun Tavern because of its alleged trademark infringement and (2) Defendant's trademark infringement is inhibiting

investor interest for the Tun Tavern to expand into Philadelphia.[4] Next, Defendant must produce

evidence for both of Plaintiffs' bases sufficient for a reasonable factfinder to determine that

irreparable harm is unlikely.

**i.    Unfair Competition Due to Trademark Infringement**

Plaintiffs argued that Defendant's The Tun establishment will unfairly compete with the

Tun Tavern. ECF No. 13 at 19. Because this Court is assuming Plaintiffs have a likelihood of

success on the merits, irreparable harm is presumed, and Defendant must produce evidence to

rebut the presumption. Defendant argued that Plaintiffs cannot show an irreparable competitive

or reputational harm or harm to goodwill because The Tun is unlikely to open until 2026, if at

all. *See Spark DSO, LLC v. Ormco Corporation*, 2022 WL 613165 at * 3 (E.D.Pa. Mar. 2, 2022)

("In order to be imminent, the injury cannot be remote or speculative; it must be poised to occur

before the District Court can hold a trial on the merits."); ECF No. 15 at 26. Defendant produced

credible evidence that it does not have close to the requisite financing to build The Tun anytime

soon. Defendant does not anticipate opening The Tun until, at the soonest, sometime in 2026.

ECF No. 27 at 69. The Foundation's goal is to raise $21 million dollars. ECF No. 15 at 9. Since

it began its fundraising efforts, Defendant has raised $4.4 million dollars to purchase land to

---

[4]      At the November 6 and 7, 2024 hearings, Plaintiffs also argued that Defendant's November 10, 2024 block
party was a basis for irreparable harm. ECF No. 29-2 at 12 ("[a]s a result of [Defendant's] event on November 10,
2024, Plaintiffs' suffered a 57% drop in revenue on the Marine Corps birthday."). Mr. Dahm claimed that the Tun
Tavern would have been sold out in years past in anticipation of his November 10, 2024 anniversary celebration of
the U.S. Marine Corps. ECF No. 31 at 61-62. At last year's Tun Tavern anniversary event, Mr. Dahm claimed 400-
500 people reserved their attendance, and a total of 600-800 actually attended. Id.
         Defendant indicated that its offerings at the block party, rather than consumer confusion, may partly
explain why its event had more reservations than Plaintiffs' event. Defendant noted that its anniversary block party
would feature, for free, the official U.S. Marine Corps Drum and Bugle Corps and President's Own bands, the
official U.S. Marines Corps Color Guard, the American Bombshells, and comedian Bryson Banks. ECF No. 32 at
15-17.
         In response to Plaintiffs' immediate concern at the hearings about Defendant's anniversary block party, this
Court issued an interim injunction enjoining Defendant from using the conjoined phrase "Tun Tavern." ECF No. 32
at 127-28. Thus, Defendant's November 10, 2024, anniversary block party was a relevant basis for irreparable harm
at the time of the hearings, but this basis is now moot at the time of this opinion because the block party event has
already passed.

construct The Tun. Id. Mr. Robert Brink (Foundation board member) predicted the Foundation needs $10 million dollars for construction financing. ECF No. 32 at 70. Thus, Defendant does not have nearly enough capital to construct and begin operation of The Tun anytime soon, and a trial on the merits could certainly occur before The Tun is even in existence.

Plaintiffs did not persuasively argue a counter to this point. They offered evidence that Patrick Dailey, the Foundation's founder, said in an email that he was "sensitive to [Mr. Dahm's] concerns that a 'Tun Tavern' in Philadelphia could hurt [Mr. Dahm's] business." ECF No. 27 at 27. But again, reputational harm or loss of business is too remote given that The Tun would not open until 2026 at best. Therefore, Plaintiff will not be irreparably harmed as to require extraordinary injunctive relief because The Tun is unlikely to open and begin competing, theoretically, against the Tun Tavern before a trial on the merits. *See Nichino Am., Inc.*, 44 F.4th at 186-87 ("Here, the District Court again appropriately referenced the *Lapp* factors for consumer confusion, described them as "closely balanced," and found that [the defendant] had rebutted the presumption by producing evidence of a sophisticated consumer class.").

### ii.    Inhibiting Investor Interest

Mr. Dahm and Mr. Driscoll—Mr. Dahm's prospective business partner to expand the Tun Tavern restaurant into Philadelphia by 2026—both testified that the present litigation caused investor financing discussions to pause. ECF No. 31 at 14, 38-39, 70. Mr. Driscoll testified that there was some "marketplace confusion" among investors regarding the difference between Plaintiffs prospective expansion into Philadelphia and Defendant's The Tun. Id. at 14-15. But Mr. Driscoll ultimately cites the present litigation, not supposed marketplace confusion, as the reason for the pause in investment discussions. Id. at 38-39 (". . . any litigation is usually a red flag for investors."). And if investors know about this present litigation and have paused

discussions consequently, then they know there is a dispute regarding trademark infringement between the parties—dispelling the notion of investor marketplace confusion between the two parties. In essence, any litigation, even litigation that does not involve the investors, had the effect of pausing negotiations and financing discussions.

Defendant produced evidence that The Tun would not open until 2026 at the earliest, but Plaintiffs' argument that missed investor opportunities is attributable to Defendant is misplaced. Plaintiffs initiated the present litigation. Any investor hesitancy due to ongoing litigation stems from Plaintiffs' voluntary decision to initiate this action; it does not stem from Defendant's alleged infringing act. Indeed, Mr. Driscoll testified it is the mere existence of this litigation, not Defendant's alleged trademark infringement, that has paused investor discussions. Id. at 38-39.

Therefore, even assuming Plaintiffs demonstrated a likelihood of success on the merits and receive a presumption of irreparable harm, Defendants produced evidence sufficient for a reasonable factfinder to determine that irreparable injury is unlikely until a trial on the merits. Because Plaintiffs have not satisfied the second element of a preliminary injunction, this Court declines to opine further on the balancing of the equities and public interest.[5]

### III.    CONCLUSION

A preliminary injunction is "an extraordinary remedy, which should be granted only in limited circumstances." *Kos Pharms.* 369 F.3d at 708. Here, even assuming Plaintiffs could establish a likelihood of success on the merits, they have not established irreparable harm. Accordingly, this Court denies Plaintiffs motion for preliminary injunction.

---

[5]    The Third Circuit has described the first two elements in a preliminary injunction as "gateway factors" that, if met, requires a court to consider the remaining two elements. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). This Court found that even if Plaintiff could likely succeed on the merits and irreparable was presumed, Plaintiffs have not sufficiently demonstrated irreparable harm. Therefore, this Court need not assess the remaining two elements.

BY THE COURT:

_____

HON. KAI N. SCOTT
United States District Court Judge